## THE WASHINGTON, ALEXANDRIA AND GEORGETOWN RAILROAD CO.

*vs.*

## D. R. MARTIN ET AL.

1. The Alexandria and Washington Railroad Company, incorporated by the Act of February 27, 1854, of the Legislature of Virginia, though the same in name with the company incorporated by the Act of Congress of March 3, 1863, is another and distinct company.

2. The Virginia company can exercise no control or ownership over that portion of the road which extends north of the Virginia line.

3. The railroad which extends from the depot of the Baltimore and Ohio Railroad in this city to the City of Alexandria, Virginia, is made up of two roads each owned by a different company, though both companies may have the same name and style in both jurisdictions, and consist of the same natural persons.

4. Where one company, claiming to own certain corporate franchises and property, has instituted proceedings in equity to secure its alleged rights, it is not irregular to admit as a party to the controversy another company who files its petition for that purpose, where the latter claims the same franchises and property, in order that the rights of both companies may be litigated and determined in the same proceeding.

5. The Act of Congress of 1863, may have intended to confer the privileges it contains upon the Virginia corporation known as the Alexandria and Washington Railroad Company, yet that company never accepted the Act, nor did it construct either the bridge or the road extending from Washington to the boundary line of the State of Virginia.

6. An Act to extend the charter of a company whose rights have been assigned to another, should be understood as conferring the new privilege upon either the company named in the Act if in existence or upon any other company which has succeeded to its rights.

7. Whether the Act was intended to confer the privileges granted to the one or the other is a question of intention.

8. Although a corporation must sue and be sued by its true name, yet where it takes a grant from the sovereign or from a deed or a will, a mistake in the name may be cured by evidence of the grantor's intention and the wrong party shall gain nothing by having the name mentioned in the grant nor the right party lose by having the wrong name.

9. Whatever doubt there may have been as to what company the Act of 1863 was intended to benefit all doubt was removed by the Act of Congress of July 26, 1866, where it was expressly affirmed that the Washington, Alexandria and Georgetown Railroad Company was the company intended to be referred to.

10. Although it is not within the competency of even the legislative power to deprive any person of a vested right by means of a declaratory Act, yet where no right has been already secured under the former Act, the legislature may declare its meaning by a subsequent law, and this will be held to be the meaning of the first law from the beginning, for no wrong is thereby inflicted since no right has become vested.

11. Hence, as the Virginia company never accepted the Act of 1863, it never acquired any rights under it and therefore sustained no injury from the passage of the declaratory Act of 1866.

In Equity. No. 773. In Special Term. Decided October 8, 1870.

BILL IN EQUITY for an injunction.

THE FACTS are stated in the opinion.

Messrs. J. H. BRADLEY, Sr., and R. T. MERRICK for plaintiff.

Messrs. J. R. BRENT and A. G. RIDDLE for defendant.

Mr. Justice WYLIE delivered the opinion of the Court:

THE BILL in this suit was filed in September, 1866, and a short time before that date another suit had been brought in this court by Davidson and Others vs. Robert W. Latham, The Washington, Alexandria and Georgetown Railroad Company and Others.

The subject of controversy, in both cases, was the railroad which extends from the depot of the Baltimore and Ohio Railroad, in this city, across the river Potomac to the city of Alexandria—a short road, but a link of great value and importance, as it forms the only railroad connection between extensive portions of the country north and south.

The court was applied to by some of the parties to these suits to restrain others from holding an election for directors, because of the immense amount of spurious and fraudulent stock which had been issued, so that no fair election could be held. Charges of gross mismanagement and dishonesty were made against those who claimed to hold the offices in and control of the company, and creditors of the company to a large amount were also parties asking that their rights might be protected by the court.

After a careful hearing of all the parties, the court

decided to place that part of the road which lies within this District, including the bridge across the Potomac, and which was all of the road which the court regarded as within its jurisdiction, in the hands of a receiver, to remain in his management, subject always, however, to the control of the court until the controversy should be finally determined, and it there remains to this time.

About the same time a similar controversy in some respects was brought before the courts in Virginia, and a receiver was appointed there as to so much of the road as lies within the limits of that State. That controversy has been determined in favor of one of the parties, the receiver has been discharged, and the road, with all its appurtenances, is now in the possession of the successful litigant.

The successful party in the Virginia controversy was the Alexandria and Washington Railroad Company, the petitioners in the present suit. Having thus gained possession of the Virginia end of the road, it has recently appeared before the court, and filed its petition in the present suit setting up a claim to the railroad bridge across the Potomac, and all the road which lies at this end, and within our jurisdiction, on the ground that is, in fact, the lawful proprietor of the whole road from Alexandria to the Baltimore and Ohio depot in this city, and denying that either of the other parties to this suit possess any lawful title or right to the same. And it adduces the decision of the courts in Virginia as settling this question in its favor.

The Virginia end of the road was constructed by a company incorporated by an act of the legislature of that State, passed February 37, 1854, by the name of the Alexandria and Washington Railroad Company; and, according to the recent adjudications by the courts of that State, the petitioner in the present case is that company, and entitled to the property and all the franchises belonging to it.

The bridge across the Potomac, and the railroad from the Virginia end of that bridge to the Baltimore and Ohio

depot in this city, was constructed long after the comple-
tion of the road at the southern end, and under the powers
conferred by an Act of Congress approved March 3, 1863,
entitled "An act to extend the charter of the Alexandria
and Washington Railroad Company, and for other pur-
poses."

The company mentioned in this act is the same in name
as the company chartered by the State of Virginia in 1854,
and by which the road between Alexandria and the south
bank of the Potomac had been built.

It appears to have been the intention of Congress in the
Act of 1863 to authorize the Virginia Company to construct
the bridge across the river and extend its road within the
District of Columbia; at least the company which at the
time of the passage of the law appeared to be the owner
and in the actual possession and control of that road.

The State of Virginia, as it has no authority to authorize
the construction of a railroad beyond its own limits, so
neither did it assume to confer any such power on the
Alexandria and Washington Company chartered by the
Act of 1854.

The Act of Congress of March 3, 1863, was therefore a
new act of incorporation creating as to this District another
and distinct company, and by referring to its provisions it
will be found to differ in many particulars and some most
important conditions from the charter granted by the State
of Virginia.

The subject matter of the two acts are different, and the
rights and franchises conferred, and the obligations and
conditions imposed, and the jurisdictions being also diverse,
these acts must be regarded as distinct acts of incorpora-
tion, and the companies severally created by them separate
and distinct companies.

In the case of the Ohio and Mississippi Railroad Com-
pany vs. Wheeler, 1 Black, 297, the Chief Justice, in deliver-
ing the opinion of the Supreme Court of the United States

says: "It is true that a corporation by the name and style of the plaintiff's appears to have been chartered by the States of Indiana and Ohio clothed with the same capacities and powers and intended to accomplish the same objects, and it is spoken of in the laws of the States as one corporate body exercising the same powers and fulfilling the same duties in both States. Yet it has no legal existence in either State, except by the laws of the States. Neither State could confer on it a corporate existence in the other, nor add to or diminish the powers to be there exercised. It may indeed be composed of, and represent under the corporate name, the same natural persons; but the legal entity or person which exists by force of law can have no existence beyond the limits of the State or sovereignty which brings it into life and endues it with its faculties and powers. The president and directors of the Ohio and Mississippi Railroad Company is, therefore, a distinct and separate corporate body in Indiana from the corporate body of the same name in Ohio."

In obedience to this doctrine has been the entire practice of this court since the present controversy was brought within its jurisdiction. The receiver appointed by the court received no authority over the Virginia end of the road, nor did the receiver appointed by the Virginia Court pretend to exercise any authority over the end of the road north of the Virginia line or over the railroad bridge in question. The road is made up of two roads, each owned by a different company, though these companies might have the same name and style in both jurisdictions and consist of the same natural persons.

It follows, therefore, that the subject of the controversy litigated in the suits of Virginia was not the property rights or franchises of the corporation created by the Act of Congress of 1863, which lie within this District, nor was the corporation created by that act a party to those proceedings.

The adjudications of the Virginia courts, therefore, however influential they ought to be regarded as authority on

the questions involved, have determined nothing judicially as to the rights of property in controversy in this proceeding.

Having prepared the way by this statement of certain important facts in this case and certain fundamental principles of law applicable thereto, we now approach its closer consideration.

As has been already stated, the present suit is between the Washington, Alexandria, and Georgetown Railroad Company, its officers, stockholders, and creditors, and relates to the property rights and franchises of that company, and none other.

This controversy pending in court the petitioner has presented itself here, and by the name of the Alexandria and Washington Railroad Company claims that it is the owner of the bridge across the river, the road and all the other property rights, &c., about which these said complainants and defendants are litigating, and asks the court that it may be admitted into the controversy as a third party and may have the receiver of the road discharged, and the road, with all its appurtenances, delivered into the petitioner's possession as the rightful owner.

The petition sets out the facts and muniments constituting the petitioner's title to the road, and several of the parties to the suit, both complainants and defendants, have filed their answers to the petition, stating also the title of the other company to the same and their rights under it.

There is nothing irregular in this method of bringing the title of the petitioner before the court.

In Wiswall *vs.* Sampson, 14 How., 68, the Supreme Court of the United States say, " This proceeding was explained by Lord Eldon in Angel *vs.* Smith, 9 Ves., 335, speaking of the rule in respect of sequestrators, and which, he held, was equally applicable in the case of receivers." " Where sequestrators," he observed, " are in possession under the process of the court, their possession is not to be disturbed,

even by an adverse title, without leave upon this principle, that the possession of the sequestrator is the possession of the court, and the court being competent to examine the title, will not permit itself to be made a suitor in a court of law, but will examine the title; and the mode is by permitting the party to come in to be examined *pro interesse suo,* the practice being to go before the master to state his title, and there is the judgment of the master and afterwards, if necessary, of the court upon it."

In the present case the title of the petitioner appears so fully set out already upon the record as to make its reference to a master for examination unnecessary.

The petitioner avers in its petition, in substance, that it is the original Alexandria and Washington Railroad Company, which was incorported in Virginia in 1854, to construct a road on the south side of the Potomac, and is the same company also which was incorporated by the act of Congress of March 3, 1863, to construct a bridge across the Potomac, and a railroad from the south end of the same, through certain streets of this city, to the depot of the Baltimore and Ohio Railroad Company. It does not aver or claim, however, that it ever accepted the Act of March 3, 1863, acted under it, constructed a bridge across the Potomac, or laid any portion of the railroad track connecting with the bridge or with the Virginia road.

The only averment on this subject contained in the petition is in the following words: "The petition of the Alexandria and Washington Railroad Company, a corporation duly chartered by the State of Virginia, duly recognized by an Act of Congress on the 3d day of March, 1863, and by certain ordinances of the Board of Aldermen and Common Council of the city of Washington, D. C."

We discover no claim on the part of this petitioner that it was ever incorporated by the Congress of the United States. It says only that it was "recognized" in a certain Act of Congress of March 3, 1863. Now the Act of 1863

was manifestly intended to confer corporate privileges within this District on some company or association of men denominated in the act the Alexandria and Washington Railroad Company, "authorized to extend their said railroad from the south side of the Potomac across said river to and along Maryland avenue," etc., "to the Baltimore and Ohio depot."

The company incorporated by this act was authorized to build a bridge across the Potomac and extend its railroad within the limits of the city. It was to be a new work entirely, and an expensive work. The Act of 1863 was accepted by some party which claimed its privileges and was willing to submit to its conditions. By that same party the bridge was built and the road extended across the river to the Baltimore and Ohio depot. The petitioner does not pretend that it did this work, or with its means ever acquired an interest in the same to the amount of one dollar. The record in this cause shows by whom this enterprise was undertaken and carried through, and that it was not by the Alexandria and Washington Railroad Company, chartered by the State of Virginia, but by a different company, namely, the Washington, Alexandria and Georgetown Railroad Company, the other party to this suit. The petitioner does not assert, nor even pretend, that it accepted the Act of 1863 as a new charter, under which it might construct the bridge and railroad within the District of Columbia as the act provides; but those works having been constructed by another company, whose exact name is not to be found in that act, it now claims a right to the road by virtue of its own more fortunate cognomen.

Now, whether the other company which assumed to accept the Act of 1863 as applying to itself has any title to the bridge or the road within this District, is not material to the question. Its title might be defective, and yet that of the petitioner would not be valid. For, concede that the act was intended to confer the privileges it contains upon the Alexandria and Washington Railroad Company, and that

7DC—9

petitioner is that company, the fact remains that this company never accepted the act, nor did it construct either the bridge or the road.

The only charter that was ever granted to the Alexandria and Washington Company, and accepted and carried into operation, was the charter of 1854, and that was a charter which was limited by the boundary line of the State of Virginia.

A few words will demonstrate the origin of the controversy which has grown up between these companies, and enable us, perhaps, to ascertain the identity of the company which, in the Act of 1863, is called the Alexandria and Washington Railroad Company, and the intention of Congress in granting that charter.

The charter granted by Virginia in 1854, to a company of this name, was generally supposed, in 1863, to have been forfeited or lost by the original company, and all its privileges and franchises, along with its property, to have become vested by purchase in a new company, whose exact name was the Washington, Alexandria and Georgetown Railroad Company.

Under a provision in the code of Virginia, the whole of the property and all the franchises of the corporation may be sold for the payment of its debts, and the purchaser may elect to organize a company under a new name, to which the property and franchises of the old one may may be conveyed; and the new one will thus become the successor of the old under the same charter.

Now in the year 1862, certain proceedings took place in Alexandria for the purpose of selling out all the property and franchises of the Alexandria and Washington Railroad Company; and one Alexander Hay became the purchaser at that sale. Mr. Hay directed the trustee to make out the conveyance to a new company, which he had styled the Washington, Alexandria and Georgetown Railroad Company.

Mr. Joseph B. Stewart was the trustee in making this

sale; and immediately after the sale he is found to have been a stockholder, along with Hay and others, in the new company, and that, too, in pursuance of an understanding entered into between himself and the purchaser previous to the sale.

The new company was organized, the stock was apportioned between the members, officers were elected, of whom Stewart was one, and the road bed and other property belonging to the old company, wherever found, were taken possession of. Every officer and every stockholder of the old company had joined the cause of the South in the rebellion; had left Alexandria, and carried away with them the rolling stock, as well as other movable property belonging to the road, and the company no longer had a place of business or any of the *indicia* of corporate existence.

Thus things remained till the Act of March 3, 1863, was passed, which was in effect a charter, as we have shown, granted to the company then in possession of the Virginia road to construct a bridge across the Potomac and extend its road to a point within the limits of the city. The new company, which had been organized on the ruins of the old, and had issued and divided its new stock amongst its originators, and which was then in actual possession of the road in Virginia, believing that it was the party to which the Act of 1863 was designed to apply, proceeded to build a bridge across the Potomac and construct and extend its road within this city as provided for in the act.

The act is entitled "An act to extend the charter of the Alexandria and Washington Railroad Company, and for other purposes." Now, the charter from Virginia was in fact a charter to the company of this name, and although we might assume that company to have been dissolved and a new company created to succeed to its privileges by the proceedings under the code, to which we have referred, yet an act which designed to confer the privileges contained in this act upon the new company might, with entire pro-

priety, be entitled an act to extend the charter of the old company, the benefits whereof had been acquired by the new company, through assignment only, and not by original grant from the State government.

And so, also, when the first section of the act declares that " the Alexandria and Washington Railroad Company be, and the same is hereby, authorized to extend their said railroad from the south side of the Potomac across said river," etc., it should be understood as conferring this privilege upon either the company so named, if supposed to be in existence, or upon any other company which had succeeded to its rights.

It is true that soon after the close of the war, and the return from the South of the persons who held the stock, and were officers of the old company, a suit was instituted by them in the Virginia courts to have the sale which was made by Stewart in 1862 set aside and declared to be utterly null and void, and that such had been the decree of all the courts there through which the cause had been carried, including the Court of Appeals; and this court, as at present advised, is not disposed to call in question the soundness of these decisions.

But these decisions can affect only the road and franchises of the company within the State of Virginia, for none other than these were the subjects of the sale made by Stewart to the new company in 1862.

It has been argued, however, that if the sale by Stewart was null and void at the time it was made, then the new company has never been in existence, and could not, therefore, have been the company which Congress authorized to extend a railroad across the river and into this District.

This conclusion, however, does not follow from that concession. The new company may have had no lawful existence under the laws of Virginia, and yet it might well have been capable of receiving a charter from Congress to build a bridge across the Potomac and a railroad within this District.

It is a question of intention on the part of Congress. Was it the design of Congress, by the Act of 1863, to confer the privileges of that act upon the only company which was in the open and undisputed possession of the Virginia road under color of title, and claiming to have succeeded to the charter and all the franchises of the old company; or to confer these privileges upon a company all of whose officers and stockholders had fled from their homes to take part with the South at the commencement of the rebellion, and who could not return if they wished, and were without the means if they had returned to execute the work which Congress had in view in granting this charter.

Although a corporation must sue and be sued by its true name, yet where it takes a grant from the sovereign, or from a deed or will, a mistake in the name may be cured by evidence of the grantor's intention.

In Angell & Ames on Corporations, the law is laid down thus: "The name of a corporation frequently consists of several words, and the transposition, interpolation, omission or alteration of some of them may make no essential difference in their sense. So in a devise to a corporation, if the words of the devise are sufficient (though the name be entirely mistaken) to show that the testator could only mean a particular corporation, it is sufficient; as, for instance, a devise to John, Bishop of Norwich, when his name is George. It was held in Massachusetts that a devise to the inhabitants of the South parish may be enjoyed by the inhabitants of the First parish."

It is a question which depends on the intention of the grantor, and the wrong party shall gain nothing by having the right name, nor the right party lose by having a wrong name.

If there could have been a doubt on the subject in the present case, Congress has itself removed it by the Act of July 26, 1863, 14 St. at L., 248, where it expressly affirms that the Washington, Alexandria and Georgetown Com-

pany was the company intended to be referred to in the Act of 1863, and grants to this company an extension of its privileges with respect to the road within this District.

Now, although it is not within the competency of even the legislative power to deprive any person of a vested right, by means of a declaratory act, yet where no right has been already secured under the former act, the legislature may declare its meaning by a subsequent law, and this will be held to be the meaning of the first law from the beginning, for no wrong is thereby inflicted, since no rights had become vested.

In the present instance, the petitioner, as we have seen, had never acquired any rights, or obtained the smallest franchise under the Act of 1863, and could sustain no injury therefore from the passage of the declaratory Act of 1866.

An amendment to the petition also set out that prior to the year 1860, the petitioner, by virtue of authority conferred by "a certain Act of Congress, and the ordinances of the city of Washington," did construct a road from the north branch of the Potomac River along Maryland Avenue to the intersection of said avenue with First street west, &c., to the Baltimore and Ohio depot, and laid its track along said route and operated and worked the same prior to said year 1860, transporting its passengers by omnibus over the Long Bridge, from the south side of the Potomac to the north side thereof."

The Act of Congress referred to is probably the Act of August 3, 1854 (40 Statutes at Large, 810), but what are the particular ordinances referred to in this amendment is not very certain, nor, in my view, is it of any consequence.

Concede that petitioner had obtained from Congress and the corporation of Washington the privilege of laying down a railroad track, as is here alleged, and that the work was completed and operated, as is here stated; yet, that was all prior to the year of 1860, after which time it is not alleged that the road was in use.

It could not, therefore, be the same railroad which was authorized by the Act of 1863 to extend from the south bank of the Potomac across the river, and to the Baltimore and Ohio depot, which is the only road with which we have anything to do in the present suit.

As all the owners and officers of that old track had abandoned it, even prior to the year 1860, it is not unfair to presume that none of it was left in 1863. It is the judgment of the court, therefore, that the prayer of this petitioner be refused, with costs.